IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| FIFTY FIRST STREET LLC d/b/a/ SPIRIT, on behalf of itself and all others similarly situated,<br><br>     **Plaintiff,**<br> vs.<br><br>THE CINCINNATI INSURANCE COMPANY; THE CINCINNATI CASUALTY COMPANY; and THE CINCINNATI INDEMNITY COMPANY,<br><br>     **Defendants.** | Case No. 2:21-cv-386 |

## CLASS ACTION COMPLAINT

Plaintiff, FIFTY FIRST STREET LLC d/b/a/ SPIRIT ("Plaintiff") brings this Class Action Complaint on behalf of itself and all others similarly situated (the "Class") against Defendants, THE CINCINNATI INSURANCE COMPANY, THE CINCINNATI CASUALTY COMPANY, and THE CINCINNATI INDEMNITY COMPANY (collectively, "Cincinnati" or "Defendant"), alleging as follows:

### NATURE OF THE CASE

1. This is a civil class action for declaratory relief and breach of contract arising from Plaintiff's contract of insurance with the Defendant.

2. At the direction of local, state, and/or federal authorities, and/or due to the COVID-19 public health emergency, Plaintiff was forced to temporarily close its event space, bar, and restaurant beginning on March 15, 2020, causing an interruption to and loss of Plaintiff's business income.

- 2 -

3. Plaintiff and the Class purchased and paid for an "all-risk" Commercial Property Coverage insurance policy from Defendant, which provides broad property insurance coverage for all non-excluded, lost business income, including the losses asserted herein.

4. Plaintiff submitted timely notice of its claim to Defendant, but Defendant has refused to provide the purchased coverage to its insured in response to Plaintiff's claim for benefits under the policy.

5. Defendant has similarly refused to, or will refuse to, honor its obligations under the "all-risk" policy(ies) purchased by Plaintiff and the other members of the putative Class of insureds.

**PARTIES**

6. Plaintiff, FIFTY FIRST STREET LLC d/b/a/ SPIRIT, is a corporation incorporated under the laws of the Commonwealth of Pennsylvania, and is a citizen of Pennsylvania. Plaintiff operates an event space, bar, and restaurant located at 242 51st Street Pittsburgh, Pennsylvania 15201 (the "Covered Property").

7. Defendant, THE CINCINNATI INSURANCE COMPANY ("Cincinnati Insurance"), is the wholly-owned subsidiary of the Cincinnati Financial Corporation, an Ohio corporation headquartered in Fairfield, Ohio. Defendants, THE CINCINNATI CASUALTY COMPANY ("Cincinnati Casualty") and THE CINCINNATI INDEMNITY COMPANY ("Cincinnati Indemnity") are wholly-owned subsidiaries of Cincinnati Insurance. Cincinnati Insurance, Cincinnati Casualty, and Cincinnati Indemnity are all headquartered in, and citizens of, Ohio. According to Cincinnati Financial Corporation's 10-K for fiscal year ending December 31, 2019, Defendant earned approximately $985,000,000 in "net written" commercial property insurance premiums in 2019, throughout the United States.

## JURISDICTION

8. This court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d), the Class Action Fairness Act, which affords federal courts with original jurisdiction over cases where any member of the plaintiff class is a citizen of a state different from any defendant (*i.e.,* so-called "minimum diversity of citizenship,") and where the amount in controversy exceeds $5,000,000, exclusive of interest and costs. Here, there exists minimal diversity of citizenship because Plaintiff (and some members of the Class) and Defendant are citizens of different states, and the aggregated claims of the putative Class members exceed $5,000,000, exclusive of interest and costs.

9. The Court has personal jurisdiction over Defendant because at all relevant times it has engaged in substantial business activities in Pennsylvania. Defendant has, at all relevant times, transacted, solicited, and conducted business in Pennsylvania through its employees, agents, and/or sales representatives, and derived substantial revenue from such business in Pennsylvania.

10. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated, in this district.

## FACTUAL BACKGROUND

### Plaintiff Purchased an "All-Risk" Policy of Property Insurance That Broadly Provides Coverage for Loss of Business Income, Among Other Things

11. Plaintiff purchased a contract of insurance from Defendant, whereby Plaintiff agreed to make payments (in the form of premiums) to Defendant in exchange for Defendant's promise to indemnify Plaintiff for losses at the Covered Property, including, but not limited to, business income losses.

- 3 -

12. Plaintiff's contract of insurance with Defendant bears Policy Number ENP0403631 (the "Policy") and is effective for the period of September 15, 2019 to September 15, 2022 (the "Policy Term"). The Policy is attached hereto as **Exhibit A**.

13. Plaintiff paid all premiums owed to Defendant under the Policy, and Defendant accepted all such premiums from Plaintiff.

14. The Policy is a form policy issued by Defendant.

15. The Policy is an "all-risk" policy, which provides the broadest property insurance coverage available.

16. The Policy provides coverage for "direct 'loss' to Covered Property at the 'premises' caused by or resulting from any Covered Cause of Loss."

17. The Policy defines "premises" as "the Locations and Buildings described in the Declarations."

18. The Policy defines "Covered Cause of Loss" as "direct 'loss' unless the 'loss' is excluded or limited in [the Policy]."

19. The Policy defines "Loss" as "accidental physical loss or accidental physical damage."

20. The Policy does not define the phrase "accidental physical loss or accidental physical damage."

21. However, the use of the disjunctive "or" in the phrase "accidental physical loss or accidental physical damage" means that coverage is triggered if <u>either</u> a physical loss of property <u>or</u> damage to property occurs. The concepts are separate and distinct and cannot be conflated.

22. Physical loss of, or damage to, property may be reasonably interpreted to occur when a covered cause of loss threatens or renders property unusable or unsuitable for its intended purpose or unsafe for ordinary human occupancy and/or continued use.

23. The Policy provides Plaintiff with, *inter alia*, various business income and extra expense coverages during the Policy Term.

24. Under the Policy, Defendant agrees to pay for the actual loss of "Business Income" and "Rental Value" sustained by Plaintiff due to the necessary suspension of operations caused by direct "loss" to the "premises" caused by or resulting from "any Covered Cause of Loss." The Policy describes the covered premises as "242 51st Street Pittsburgh, Pennsylvania 15201," the Covered Property.

25. Additional coverage is provided under the Policy for business income losses resulting from an "action of civil authority" which prohibits access to the Covered Property, related to a "Covered Cause of Loss" at property other than the Covered Property.

26. The Policy also provides coverage for "actual loss of 'Business Income' you sustain" caused by a "direct 'loss' to 'dependent property' caused by or resulting from any Covered Cause of Loss." Dependent property is defined as "property operated by others whom you depend on to: a) Deliver materials or services. . . b) Accept your products or services; c) Manufacture products for delivery to your customers under contract of sale; or d) Attract customers to your business."

27. Members of the Class also purchased a policy of insurance from Defendant providing for the same business income loss coverage and using the same form policy provisions.

### In Response to Covid-19, Pennsylvania and Other State Governments Issue Sweeping Orders Shutting Down "Non-Essential" Businesses

28.     Severe acute respiratory syndrome coronavirus 2 ("COVID-19") has spread, and continues to spread, rapidly across the United States and has been declared a pandemic by the World Health Organization ("WHO"). *See* https://www.health.harvard.edu/diseases-and-conditions/coronavirus-resource-center (last accessed July 31, 2020).

29.     The global COVID-19 pandemic is exacerbated by the fact that the deadly virus physically infects and stays on surfaces of objects or materials for many days.

30.     According to a study published in *The New England Journal of Medicine*, COVID-19 is widely accepted as a cause of real physical loss and damage. It remains stable and transmittable in aerosols for up to three hours, up to four hours on copper, up to 24 hours on cardboard and up to two to three days on plastic and stainless steel. *See* https://www.nih.gov/news-events/news-releases/new-coronavirus-stable-hours-surfaces (last accessed July 31, 2020).

31.     Another study, published in the *Journal of Hospital Infection*, found: "Human coronaviruses can remain infectious on inanimate surfaces at room temperature for up to 9 days. At a temperature of 30°C or more the duration of persistence is shorter." *See* https://www.inverse.com/science/coronavirus-4-studies-explain-how-covid-19-sticks-to-surfaces (last accessed July 31, 2020).

32.     On March 6, 2020, the Governor of Pennsylvania Tom Wolf declared a "Disaster Emergency" throughout the Commonwealth of Pennsylvania.[1]  Thereafter, on March 15, 2020,

---

[1] https://www.governor.pa.gov/wp-content/uploads/2020/03/20200306-COVID19-Digital-Proclamation.pdf

Governor Wolf announced that mitigation efforts were being put into place starting on March 16, 2020, that closed dining areas of restaurants and bars to help stop the spread of COVID-19.[2]

33. On March 19, 2020, the Governor of Pennsylvania issued an Executive Order closing all non-essential businesses. Specifically, the Executive Order, which became effective immediately upon its issuance, mandated that:

> No person or entity shall operate a place of business in the Commonwealth that is not a life sustaining business regardless of whether the business is open to members of the public.[3]

34. The Executive Order continued the dine-in prohibition for restaurants and bars, and closed event venues.

35. On March 23, 2020, the Governor of Pennsylvania issued a Stay at Home Order for all residents of the Commonwealth of Pennsylvania, mandating that residents stay home "except as needed to access, support, or provide life-sustaining business, emergency, or government services."[4]

36. Also on March 23, 2020, the Pennsylvania Department of Health issued a Stay at Home Order, directing all individuals residing in the Commonwealth to remain at home.[5]

37. On May 3, 2020, the Governor of Pennsylvania announced the state's plan to reopen certain counties within the Commonwealth, transitioning such counties to "yellow," which

---

[2] https://www.governor.pa.gov/newsroom/wolf-administration-orders-restaurants-and-bars-to-close-dine-in-service-in-mitigation-counties-to-stop-spread-of-covid-19/

[3] Governor Wolf, "Order of the Governor of the Commonwealth of Pennsylvania Regarding the Closure of All Businesses that are not Life Sustaining," (Mar. 19, 2020) https://www.governor.pa.gov/wp-content/uploads/2020/03/20200319-TWW-COVID-19-business-closure-order.pdf ("Executive Order").

[4] Governor Wolf, "Order of the Governor of the Commonwealth of Pennsylvania For Individuals to Stay Home," (Mar. 23, 2020), https://www.governor.pa.gov/wp-content/uploads/2020/03/03.23.20-TWW-COVID-19-Stay-at-Home-Order.pdf.

[5] https://www.governor.pa.gov/wp-content/uploads/2020/03/03.23.20-SOH-Stay-at-Home-Order.pdf

allowed low-risk businesses such as Plaintiffs to open. Allegheny County, where Plaintiff's business is located, was transitioned to "yellow" on May 15.[6]

38. On June 5, 2020, Governor Wolf allowed Allegheny County to transition to "green."[7] In the "green" phase, the Stay-at-Home Order was lifted, and restaurants and bars were able to open their indoor seating areas, but had to adhere to seating limitations and social distancing.[8] Event venues were to have a maximum of 250 people.

39. Due to an increase in COVID-19 cases, on July 15, 2020, Governor Wolf issued an Order Directing Targeted Mitigation Measures, reinstating certain restrictions on, amongst other things, event venues, bars, restaurants, nightclubs, and fitness centers.[9] For event venues, gatherings must be of 25 people or less. For restaurants, the Order provides that restaurants operating indoors may only do so at 25% capacity. This Order further mandated that all businesses are required to conduct their operations remotely, "[u]nless not possible."[10] There is no expiration date on this Order.

40. On October 5, 2020, Governor Wolf allowed event venues to open at a limited capacity based upon the following three-tier format:

---

[6] https://www.publicsource.org/allegheny-yellow-phase-news/#:~:text=Gov.,said%20at%20a%20press%20conference.

[7] https://www.alleghenycounty.us/uploadedFiles/Allegheny_Home/Health_Department/Programs/Food_Safety/060520-Green-Phase-Food-Facilities.pdf

[8] https://www.governor.pa.gov/newsroom/gov-wolf-issues-updated-green-phase-order-guidance-on-dining-and-professional-sports/

[9] https://www.governor.pa.gov/wp-content/uploads/2020/07/20200715-TWW-targeted-mitigation-order.pdf

[10] *Id.*

| Maximum Occupancy | Allowable Indoor Rate |
|---|---|
| 0-2,000 people | 20% of Maximum Occupancy |
| 2,001 - 10,000 people | 15% of Maximum Occupancy |
| Over 10,000 people | 10% of Maximum Occupancy up to 3,750 people |

Maximum Occupancy Calculator for outdoor events:

| Maximum Occupancy | Allowable Outdoor Rate |
|---|---|
| 0-2,000 people | 25% of Maximum Occupancy |
| 2,001 - 10,000 people | 20% of Maximum Occupancy |
| Over 10,000 people | 15% of Maximum Occupancy up to 7,500 people |

[11]

41. On December 10, 2020, due to a spike in COVID-19 statistics, Governor Wolf issued additional mitigation protective orders closing indoor dining and limiting indoor events to no more than 10 people effective starting on December 12, 2020.[12] The December 10 order expired on January 4, 2021.

42. Most other states, including those in which the putative Class members reside and/or do business, have issued similar compulsory shut-down orders for "non-essential" businesses, or businesses deemed not to be "life sustaining."

43. The closure of all "non-life-sustaining businesses" evidences an awareness on the part of both state and local governments that COVID-19 causes loss of or damage to property. This is particularly true in places where business is conducted, as the contact and interaction necessarily incident to such businesses causes a heightened risk of the property becoming contaminated.

---

[11] https://patch.com/pennsylvania/pittsburgh/pa-eases-occupancy-restrictions-indoor-outdoor-venues
[12] https://www.governor.pa.gov/newsroom/gov-wolf-sec-of-health-announce-new-protective-mitigation-efforts-to-put-pennsylvania-on-pause-through-early-january/

44. For example, a New York City Executive Order entered on March 16, 2020 specifically acknowledged that: "[COVID-19] physically is causing property loss and damage." *See* https://www1.nyc.gov/assets/home/downloads/pdf/executive-orders/2020/eeo-100.pdf (last accessed July 31, 2020).

45. Similarly, in a March 16, 2020 proclamation, the City of New Orleans acknowledged COVID-19's "propensity to attach to surfaces for prolonged periods of time, thereby spreading from surface to person and causing property loss and damage in certain circumstances." *See* https://nola.gov/mayor/executive-orders/emergency-declarations/03162020-mayoral-proclamation-to-promulgate-emergency-orders-during-the-state-of-emergency-due-to-co/ (last accessed May 6, 2020).

46. In upholding the Governor of Pennsylvania's Proclamation of a state-wide disaster and the Executive Orders mandating the closure of businesses within Pennsylvania, the Pennsylvania Supreme Court noted the significant risk of the spread of the COVID-19 virus, even in locations where the disease has not been detected:

> Covid-19 does not spread because the virus is "at" a particular location. Instead it spreads because of person-to-person contact, as it has an incubation period of up to fourteen days and that one in four carriers of the virus are asymptomatic. Respondents' Brief at 4 (citing Coronavirus Disease 2019, "Symptoms," CDC, https://www.cdc.gov/coronavirus/2019-ncov/symptoms-testing/symptoms.html (last accessed 4/9/2020)). The virus can live on surfaces for up to four days and can remain in the air within confined areas and structures. *Id.* (citing National Institutes of Health, "Study suggests new coronavirus may remain on surfaces for days," (Mar. 27, 2020) https://www.nih.gov/news-events/nih-research-matters/study-suggests-new-coronavirus-may-remain-surfaces-days (last accessed 4/9/2020) and Joshua Rabinowitz and Caroline Bartman, "These Coronavirus Exposures Might be the Most Dangerous," The New York Times (Apr. 1, 2020) https://www.nytimes.com/2020/04/01/opinion/coronavirus-viral-dose.html).

*Friends of DeVito v. Wolf*, 227 A.3d 872, 891 (Pa. 2020).

47. Because the COVID-19 virus can survive on surfaces for up to fourteen days, the Pennsylvania Supreme Court ultimately concluded that "any location . . . where two or more people can congregate is within the disaster area."

48. Further, the WHO has indicated that airborne transmission, "particularly in specific indoor locations, such as crowded and inadequately ventilated spaces" poses a significant risk.[13]

49. The CDC has warned that exposure to an individual with COVID-19 for fifteen minutes or more, or close contact within six feet of distance, is enough to justify a personal quarantine.[14]

**Plaintiff Submits a Claim Under Its "All-Risk" Policy, and Defendant Wrongly Refuses To Honor Its Obligations Respecting Same**

50. As a result of the orders, guidance and protocols issued by the Governor of Pennsylvania, Pennsylvania Department of Health, the WHO and the CDC relating to Plaintiff's business (collectively the "**Mandated Shutdown Rules**"), the Covered Property closed on March 15, 2020. Since that time, Plaintiff has been unable to fully operate as an event center, restaurant, or bar. Plaintiff was able to re-open the event center under very limited capacity restrictions, which Plaintiff found not financially viable to operate within. Plaintiff was also able to re-open the indoor seating area on May 15, 2020, but only at 50% capacity, which was subsequently reduced to 25%, and ultimately prohibited from opening again on December 12.

51. Plaintiff has incurred, and continues to incur, among other things, a substantial loss of business income, including additional expenses covered under the because of the Mandated Shutdown Rules.

---

[13] https://apnews.com/648feb226473f9841920abd6ffb004c7
[14] https://www.cdc.gov/coronavirus/2019-ncov/php/public-health-recommendations.html

52. Shortly after closing its business Plaintiff provided notice to Defendant of its claim for the interruption to its business.

53. Defendant refused to pay Plaintiff's claim by letter dated September 22, 2020, attached hereto as **Exhibit B.** In its letter, Defendant concludes that, "[a]s submitted, the claim involves the Novel Coronavirus known as SARS-CoV-2, which causes the viral infection known as COVID-19 . . . Cincinnati has determined that coverage is unavailable for the claimed loss." Narrowing the plain meaning of "accidental physical loss or accidental physical damage," Defendant then states "this claim does not involve, direct, physical loss to property at your premises caused by a Covered Cause of Loss."

**Contrary To Defendant's Position, Plaintiff's Losses Arise From Direct Physical Loss Or Damage**

54. Plaintiff's Covered Property suffered direct physical loss or damage due to the Mandated Shutdown Rules requiring Plaintiff discontinue its primary use of the Covered Property. The Mandated Shutdown Rules, in and of themselves, constitute a Covered Cause of Loss within the meaning of the Policy.

55. Alternatively, and to the extent the Mandated Shutdown Rules do not constitute a Covered Cause of Loss within the meaning of the Policy, the COVID-19 public health emergency and the ubiquitous nature of the COVID-19 virus caused a direct physical loss or damage to Plaintiff's Covered Property. Specifically, the Covered Property has been rendered unusable for its intended purpose because the highly contagious nature of COVID-19, particularly when people gather inside a building or other closed space for extended periods of time, precludes any meaningful use of the Covered Property.

56. Further, and as an additional basis for coverage under the Policy, the ubiquitous nature of the COVID-19 virus, as explained above, caused direct physical loss or damage to

property other than Plaintiff's Covered Property, and such loss or damage resulted in an "action by civil authority" prohibiting access to Plaintiff's Covered Property, within the meaning of the Policy.

57. Additionally, Plaintiff's "dependent property" suffered direct physical loss or damage as a result of the Mandatory Shutdown Rules, or in the alternative, the ubiquitous nature of the COVID-19 virus, resulting in lost business income to Plaintiff, within the meaning of the Policy.

## CLASS ACTION ALLEGATIONS

58. Plaintiff brings this action individually and as a class action on behalf of the Class, defined as follows:

> All policyholders in the United States who purchased commercial property coverage, including business or interruption income (and extra expense) coverage from Defendant and who have been denied coverage under their policy for lost business income after being ordered by a governmental entity, in response to the COVID-19 pandemic, to shut down or otherwise curtail or limit in any way their business operations.

59. Excluded from the Class are Defendant and its officers, directors, legal representatives, successors, subsidiaries, and assigns. Also excluded from the Class are any judicial officer presiding over this matter, members of their immediate family, and members of their staff.

60. The members of the Class are so numerous and geographically dispersed that joinder would be impracticable. Class members are readily identifiable from information and records in Defendant's possession, custody, or control.

61. There is a well-defined community of interest in the common questions of law and fact affecting the Class members. These common legal and factual questions include, but are not limited to:

    a. whether Defendant owed coverage to Plaintiff and the Class;

      b.      whether any exclusions to coverage apply;

      c.      whether Plaintiff and members of the Class are entitled to damages and, if so, the measure of such damages; and

      d.      whether Plaintiff and members of the Class are entitled to equitable, declaratory and/or other relief, and if so, the nature of such relief.

62.    Plaintiff's claims are typical of the claims of the absent class members and have a common origin and basis. Plaintiff and absent Class members are all injured by Defendant's refusal to afford the purchased coverage. Plaintiff's claims arise from the same practices and course of conduct giving rise to the claims of the absent Class members and are based on the same legal theories, namely the refusal to provide insurance coverage for the loss. If prosecuted individually, the claims of each Class member would necessarily rely upon the same material facts and legal theories and seek the same relief. Plaintiff's claims arise from the same practices and course of conduct that give rise to the other Class members' claims and are based on the same legal theories.

63.    Plaintiff will fully and adequately assert and protect the interests of the absent Class members and has retained Class counsel who are experienced and qualified in prosecuting class action cases similar to this one. Neither Plaintiff nor Plaintiff's attorneys has any interests contrary to or conflicting with the interests of absent Class members.

64.    The questions of law and fact common to all Class members predominate over any questions affecting only individual class members.

65.    A class action is superior to all other available methods for the fair and efficient adjudication of this lawsuit because individual litigation of the absent Class members' claims is economically infeasible and procedurally impracticable. Class members share the same factual and legal issues and litigating the claims together will prevent varying, inconsistent, or contradictory judgments, and will prevent delay and expense to all parties and the court system through litigating

multiple trials on the same legal and factual issues. Class treatment will also permit Class members to litigate their claims where it would otherwise be too expensive or inefficient to do so. Plaintiff knows of no difficulties in managing this action that would preclude its maintenance as a class action.

66. Additionally, the prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for Defendant. Such individual actions would create a risk of adjudications that would be dispositive of the interests of other Class members and impair their interests. Defendant, through its uniform conduct, acted or refused to act on grounds generally applicable to the Class as a whole, making declaratory relief appropriate to the Class as a whole.

## COUNT I
## DECLARATORY RELIEF

67. Plaintiff incorporates by reference each and every allegation set forth above.

68. The Declaratory Judgment Act, 28 U.S.C. § 2201(a), provides that in "a case of actual controversy within its jurisdiction . . . any court of the United States . . . may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a).

69. An actual controversy has arisen between Plaintiff and the Defendant as to the rights, duties, responsibilities and obligations of the parties in that Plaintiff contends and Defendant disputes and denies that the Policy provides coverage to Plaintiff for any current and future lost business income, subject to the limit of liability, for the temporary suspension of Plaintiff's operations.

70. Plaintiff continues to suffer injury and is at risk of future loss as a result of Defendant's failure to abide by its coverage obligation under the Policy. The July 15, 2020 Executive Order and December 10 additional mitigation efforts by Governor Wolf in Pennsylvania demonstrates the risk of future loss to Plaintiff. Furthermore, the mere occurrence of the COVID-19 virus in the United States in 2021 demonstrates the future risk that Plaintiffs' could suffer property loss as a result of another widespread virus and related government shutdown orders.

71. The Policy provides coverage for direct 'loss' to Covered Property, with "loss" defined as "accidental physical loss or accidental physical damage."

72. Plaintiff's loss of use, loss of access, and loss of functionality of the Covered Property when the Mandated Shutdown Rules made it unlawful for Plaintiff to fully access, use, and operate its business at the Covered Property, constitutes a "loss" to the Covered Property under the Policy. Alternatively, the ubiquitous nature of the COVID-19 virus caused a "loss" to the Covered Property by preventing Plaintiff from using the Covered Property for its intended purpose.

73. Additionally, the Mandated Shutdown Rules or, alternatively, the ubiquitous nature of the COVID-19 virus, caused a "loss" to property other than the Covered Property, thereby invoking coverage under the Policy's "Civil Authority" provision for "actual loss of 'Business Income' . . . caused by action of civil authority that prohibits access to the 'premises.'"

74. Further, the Mandatory Shutdown Rules, or alternatively, the ubiquitous nature of the COVID-19 virus, caused physical loss or damage to Plaintiff's "dependent property" thereby invoking coverage under the Policy's Dependent Property provision, which provides for the payment of lost Business Income when a Covered Cause of Loss damages "dependent property."

75. The Policy constitutes a valid and binding agreement obligating the Defendant to indemnify Plaintiff for covered losses. Plaintiff has substantially performed or otherwise satisfied

all conditions precedent to bringing this action and obtaining coverage pursuant to the Policy and applicable law, or alternatively, Plaintiff has been excused from performance by Defendant's acts, representations, conduct, or omissions.

76. Defendant has failed to indemnify Plaintiff for its covered losses.

77. No exclusion to coverage applies.

78. Plaintiff has suffered and continues to suffer a covered loss under the Policy.

79. Plaintiff, individually and on behalf of the Class, seeks a Declaratory Judgment that there is coverage for its business interruption losses under the Policy.

## COUNT II
## BREACH OF CONTRACT

80. Plaintiff incorporates by reference Paragraphs 1 through 66 above as if fully set forth above.

81. Plaintiff and Defendant entered into a contract of insurance; here, the Policy.

82. As an insurer, Defendant has a duty of good faith and fair dealing towards its insureds, including the obligation to pay for the financial losses suffered by the Plaintiff and members of the Class because of the Mandated Shutdown Rules.

83. Plaintiff and members of the Class had a reasonable expectation that the financial losses suffered because of the Mandated Shutdown Rules would be covered under the Policy.

84. The Class members entered into a substantially identical policy with Defendant.

85. Under the Policy, Defendant agreed to indemnify Plaintiff and the Class for their business losses as a result of a covered loss.

86. Plaintiff and the Class members suffered a covered loss under the Policy.

87. Plaintiff and the Class members timely submitted a notice of claim and satisfied all conditions precedent to receiving the coverage it purchased from Defendant.

88. Defendant breached its contract with Plaintiff and the Class members by failing and refusing to provide the contracted for coverage.

89. Defendant's breach of the contract has caused Plaintiff and the Class to suffer damages in the amount of their unreimbursed business losses or their limits of liability, whichever is lower.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff herein prays as follows:

1) For a declaration that there is coverage under the Policy for the interruption to Plaintiff's business and the associated business income lost therefrom;

2) For damages, costs and attorney's fees; and

3) For such other relief as the Court may deem proper.

**TRIAL BY JURY IS DEMANDED AS TO ALL COUNTS SO TRIABLE**

Respectfully submitted,

Date: March 23, 2021

*/s/ Gary F. Lynch*

Gary F. Lynch
Kelly K. Iverson
**CARLSON LYNCH LLP**
1133 Penn Avenue, 5th Floor
Pittsburgh, PA 15222
P: (412) 322-9243
F: (412) 231-0246
glynch@carlsonlynch.com
kiverson@carlsonlynch.com

*Counsel for Plaintiff*